## THE ATLANTIS.

### (Circuit Court of Appeals, Sixth Circuit. January 6, 1903.)

### Nos. 1,094, 1,095.

**1. COLLISION—CONTRIBUTORY FAULT—PRESUMPTION.**

The fault of an overtaking vessel for a collision being established, in determining the question of the contributory fault of the vessel overtaken, every reasonable doubt should be resolved in her favor.

**2. SAME—OVERTAKING VESSELS—EFFECT OF SUCTION.**

The Owen, a large and heavily laden steamer, passing up the Detroit river, overtook and attempted to pass the Atlantis, a much smaller vessel, and while so passing the Atlantis sheered and came into collision with the Owen. It did not appear that the sheer was due to any action of her helm, but rather that it was the effect of suction caused by the Owen, and that the helm was not changed until the effect of the suction was felt, when it was used in an effort to overcome it. *Held* that, it being the duty of the Owen, as the overtaking vessel, to keep out of the way and to pass at a safe distance, taking into account the danger from suction, the Atlantis was not in fault for not changing her course to give more room, even if it could safely have been done, which was a matter in dispute, nor because of any unskillful maneuvers attempted in extremis, but that the fault was solely that of the Owen in coming too close to the Atlantis without necessity.

Appeals from the District Court of the United States for the Eastern District of Michigan.

Gray & Gray (Shaw, Warren, Cady & Oakes, of counsel), for libelant.

S. S. Babcock (Frank H. Canfield, of counsel), for respondents.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

DAY, Circuit Judge. The merits of the controversy arising from the collision between vessels navigating the Detroit river are presented in case No. 1,094, being an appeal from a decree in admiralty holding both steamers responsible for the resulting disaster. The colliding vessels were the John Owen and the Atlantis, the former owned by the J. Emory Owen Transportation Company, and the latter by John W. Snook. The steamer Owen was a vessel of steel and wood; length of keel, 281 feet, over all 300 feet, with a beam of 41 feet, and a depth of 20 feet. The Atlantis was a much smaller steamer; 109 feet keel, 117 feet over all, 22 feet beam, and 6 feet depth of hold. At the time of the collision both boats were bound up the river, the Owen laden with 3,000 tons of coal, and drawing 16 feet, and the Atlantis with 250 tons of coal, and drawing 8 feet 6 inches aft, and 6 feet 4 inches forward. The collision occurred in the early morning of October 28, 1898. It was moonlight and clear, and very little wind was blowing. The place of collision was probably 600 feet below the South lightship, at the cut known as the "Lime Kiln Crossing." The Owen, which was the overtaking boat, had blown the passing signal of two blasts, which was responded to by the Atlantis with a consent signal. Just as the Owen was about to turn from the Bois Blanc range on to the North and South ranges, going up the cut, her captain sung out to the officer in charge of the Atlantis to "look out for himself," and, putting his helm to starboard, started to make the swing on to the North and South ranges. While the stern of the Owen was swinging toward the Atlantis, the latter vessel, which was on the starboard side of the Owen, was either drawn or steered in such way as to take a sudden sheer to port against the Owen, the vessels coming in contact in such wise that the Atlantis was held against the Owen until, by the backing of the vessels, she was released, and passed astern of the Owen. The effect of the collision was to send the Owen to the eastward upon the rocks, doing her considerable damage. The learned judge who tried the case in the district court found both vessels at fault, and divided the damages. From this decree the Owen did not take an appeal, and we may regard her fault as established, and need not consider that question any further than it enters into the discussion of the alleged fault of the Atlantis.

From the conflicting statements of the officers and men upon these two ships, we are to endeavor to get at the truth of this casualty, with the resulting liability of the respective vessels. It is claimed, on the one hand, that the Owen, after giving the passing signal and receiving permission to pass by the response of the Atlantis, was proceeding to do so on the port side of the Atlantis, at a slow rate of speed and at a safe distance, when the Atlantis, some 200 feet away, took a sudden sheer toward the Owen, recovered herself, and

almost immediately after regaining her course took another and more decided sheer into the Owen, striking her about 10 feet from her stern on the starboard side. On the other hand, it is asserted that the Owen came within 50 or 60 feet of the Atlantis, causing her stern first to be drawn within the influence of the suction from the Owen. This, overcome by starboarding the wheel a little, was followed by the pulling of her bow sharply to port, when the influence of the suction reached that part of the vessel, causing her to come into contact with the Owen about 10 feet from her stern, and at a point on the Atlantis 16 to 18 feet back of the stem, where she was held for a short time until she was released by the combined efforts of the two boats.

The first of these accounts, which may be called that of the Owen, seems highly improbable on its face. Whatever the rate of speed at which the Owen was passing the Atlantis,—and there is great conflict in the testimony on this subject,—it was faster than the latter vessel was going. Those in charge of the Owen place the first sheer at a time when the Atlantis' bow was opposite the pilot house of the Owen, the second when her bow was opposite a point about 75 feet from the stern of the Owen. The Atlantis is placed on a course about 200 feet from the Owen. It would seem incredible that the Atlantis, so far away, could have made these maneuvers while the Owen was going at a faster rate, and yet come into collision. It was most probable, and we think the testimony shows, that the vessels were closer together. Assuming it possible that the Atlantis could have been carried across the intervening channel by the force of her wheel alone, there is no motive for such a course, unless her navigators were willfully seeking a collision. The character of the "sheer" or "dive" of the Atlantis toward the Owen was such as clearly demonstrated the presence of some force other than the action of her rudder. The City of Brockton (D. C.) 37 Fed. 897.

That the smaller vessel was likely to be acted upon by the suction of the larger, we think, is apparent. It was a danger which should have been calculated upon by the navigator of the Owen. This force of suction, though the source of no little difference of opinion as to its mode of operation in a given situation, is recognized by the courts, and as well by practical navigators. It has undoubtedly been the cause of many marine collisions. Although our knowledge of its methods of operation and effects may not be reduced to an exact science, yet, as was said by Judge Lurton in the case of The Ohio, 33 C. C. A. 671, 91 Fed. 551: "Suction is a force to be reckoned with and to be guarded against when vessels pass in close proximity." The Alexander Folsom, 3 C. C. A. 165, 52 Fed. 403; The City of Cleveland (D. C.) 56 Fed. 729; The Mesaba (D. C.) 111 Fed. 215; The Aureole, 51 C. C. A. 181, 113 Fed. 224. It is apparent that many of the conditions most favorable to the operation of suction were here present. A large ship was passing a smaller one in a comparatively narrow and shallow channel. The theory is that the water displaced and "piled up" in front and along the sides of the passing vessel must flow back again into the opening made to accommodate the vessel as she passes along her course. The water, when it thus

begins to flow backward, exerts an influence to draw with it any passing vessel near enough to feel its effects. If the vessel is small and the channel shallow, so that more water to fill the space must come from the sides than below, it is very liable to yield to the power thus exerted and be deflected from its course. In the present case there is almost a complete demonstration of the exertion of this force by the Owen upon the Atlantis in the relation of the two vessels at the time of the collision.

What was the fault of the Atlantis? It was the duty of the overtaking vessel to keep out of the way, and to choose a place for passing which would not imperil the Atlantis. Spencer, Collisions, § 71, states the rule to be:

"A vessel of superior speed running astern of a slower one is not obliged to retard its own speed because of the inability of the leading ship to proceed at as great a rate. It has the right to pass if it can do so with safety to both. It must be its own judge as to the matter of safety; and, if the result shows it to have been in error as to the propriety of passing, it must suffer the consequences of its act; and the burden of proof rests upon it to show not only the prudence of her own conduct, but also the negligence of the other, where negligence is charged; and, failing to do this, she must be held accountable for the result."

Rule 22 specifically provides:

"Notwithstanding anything contained in these rules, every vessel overtaking any other shall keep out of the way of the overtaken vessel."

It was the duty of the Atlantis to hold her course. The Governor, 1 Abb. Adm. 108, Fed. Cas. No. 5,645. It was not her duty to keep away from the Owen. Undoubtedly, after the collision became imminent, it was her duty to do all that prudent seamanship required to avoid the collision. It is claimed that not only did the Atlantis contribute to the accident by faulty steering, but she could go, and under the circumstances it was her duty to go, farther to the eastward and give the Owen more room. As to the first of these claims, we have already stated our conclusion that the force which caused the Atlantis to "dive" toward the Owen was more than her rudder would likely exert. The testimony shows that the Atlantis was already to the eastward of the Bois Blanc range when she began to feel the force of the Owen's suction, drawing her stern to port toward the Owen. The mate in charge of the Atlantis gave his wheelsman the order to "watch his starboard wheel," and it was put over a short distance to starboard, almost immediately the mate noticed the bow being sharply drawn toward the Owen, and gave the order to "port—hard aport," and himself sprang to the wheel to help the man there to put and keep the wheel hard aport. In almost the same instant, the master of the Owen swung her stern to starboard with a view, as he says, to take the North and South ranges, and the collision was inevitable. Had he delayed a very short space of time, as we think he ought to have done, the collision would have been avoided. It may be that the Atlantis might have safely gone further to the eastward when the collision became imminent, but her master says that he feared the rocks on the eastern side of the channel, and was already as far over as he deemed it prudent to go. We find nothing to contradict him or to enable us to say that his

judgment was faulty. He was in extremis, placed there by the wrongful act of the Owen in unduly crowding upon the course of the Atlantis. Under such circumstances, a master may be excused if he does not maneuver with perfect skill, or even if he acts mistakenly under such pressure, or omits to do all that ought to be done. The Elizabeth Jones, 112 U. S. 514, 5 Sup. Ct. 468, 28 L. Ed. 812; The Maggie J. Smith, 123 U. S. 349, 8 Sup. Ct. 159, 31 L. Ed. 175; The Iron Chief, 11 C. C. A. 196, 63 Fed. 289. The same reasoning applies to the other maneuvers at the time of the collision. It may be that the wheel was put over a little too far to the starboard, although this is by no means clear, but it was the action of one seeking to avoid the sudden peril to which the misconduct of the overtaking vessel had exposed him. As to the incapacity of the Atlantis' wheelsman, he was probably not one of great skill. This fact is admitted by the mate of the Atlantis, and is evident from his manner of testifying when on the stand, but he seems to have been adequate to the situation, and to have promptly obeyed the orders of the mate given at the time. Upon the whole case, we are unable to discover any fault on the part of the Atlantis, made out by the weight of testimony, warranting her condemnation as a contributor to the injury.

In this case the fault of the Owen is established by failure to appeal, and we think the testimony leaves no doubt about its sufficiency to cause the disaster. In such contingency, it is not enough that a doubt be raised as to the propriety of the conduct of the navigators of the Atlantis. Any such reasonable doubt should be resolved in her favor. The Livingstone, 51 C. C. A. 560, 113 Fed. 879, and cases cited.

This conclusion renders it unnecessary to consider the question raised by the appeal in No. 1,095 as to the right to recover interest on the decree against the Atlantis. The decree of the district court, in so far as it holds the Atlantis liable, is reversed, and both causes in appeal remanded, with instructions to enter a decree holding the Owen solely at fault, with costs in favor of the owners of the Atlantis in both courts.